1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*E-FILED - 3/3/11*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARTIN LUNA TORRES,                    )     No. C 09-2431 RMW (PR)
                                       )
               Petitioner,             )     ORDER DENYING PETITION FOR
                                       )     WRIT OF HABEAS CORPUS;
     vs.                               )     DENYING CERTIFICATE OF
                                       )     APPEALABILITY
WARDEN DERRAL G. ADAMS,                )
                                       )
               Respondent.             )
_____)

Petitioner, a state prisoner proceeding pro se, seeks a writ of habeas corpus pursuant to

28 U.S.C. § 2254.  Respondent was ordered to show cause why the writ should not be granted.

Respondent has filed an answer, along with a supporting memorandum of points and authorities

and exhibits.  Petitioner has responded with a traverse.  For the reasons set forth below, the

petition for a writ of habeas corpus is **DENIED**.

## BACKGROUND[1]

Amanda Jacobs, a prostitute, testified that in the early morning of January 14, 2002, she

was engaged in a sexual transaction in a client's car when she noticed in the rear view mirror a

parked white car.  (Resp. Ex. B at 2.)  She saw a man get out of the driver's side door, pull a

woman's body out of the passenger side car door, drag her along the ground, and throw her

_____

[1]  The facts of this case are taken from the California Court of Appeal opinion in People
v. Torres, No. 114581, 2007 WL 4285285 (Cal. App. 1 Dist. Dec. 7, 2007) (Resp. Ex. B.)

1  down.  (Id.)  Around 4:40 a.m., just before Jacobs had an opportunity to write down the license

2  plate number of the white car, the police showed up.  (Id. at 3.)  Jacobs reported to the police that

3  there was a dead body behind her car, that she recognized the victim as a prostitute named

4  Sabrina, and that petitioner was the man who dragged Sabrina from the car.  (Id.)

5  Officer Leong, the officer who spoke with Jacobs, called for backup.  (Id. at 3-4.)  Officer

6  Ciudad responded to Leong's request and saw a female victim lying in the street with a plastic

7  bag wrapped around her neck.  (Id. at 4.)  Officer Tozzini also responded to the call for backup

8  and noticed the female victim was mostly unclad and "pretty much naked."  (Id.)  Her jeans were

9  around her feet, there was a brownish and bloody condom by her feet, and a plastic bag was

10  around her neck.  (Id.)  Ciudad and Tozzini noticed petitioner sitting in the driver's seat with his

11  arms crossed over his chest and his eyes closed.  (Id.)

12  Officer Lawrence knocked on the driver's side door and summoned petitioner out of the

13  car.  (Id. at 5.)  Petitioner saw the body and exclaimed, "Oh, my God."  (Id.)  Jacobs, Ciudad,

14  and Tozzini remarked that petitioner did not appear intoxicated.  (Id. at 4-5.)

15  Police Inspector Fitzgerald-Wermes arrived as the crime scene investigator around 6:00

16  a.m.  (Id. at 5.)  She noticed that the victim had abrasions all over her body, neck and chin.  (Id.)

17  She found a white condom with fecal matter.  (Id.)  She also noticed bruising along the victim's

18  throat that was consistent with strangulation, and a pattern on the victim's chin consistent with

19  the pattern on the fabric of the seat cover of petitioner's car.  (Id.)  She testified that when rigor

20  mortis sets in, the body picks up patterns of the surface it is lying on because the skin becomes

21  flaccid.  (Id.)

22  Forensic testing of the condom, an item of clothing from the crime scene, and a sample of

23  fecal matter from the crime scene revealed that samples from the condom were consistent with

24  the DNA from both the victim and petitioner.  (Id. at 6.)  Swabs from the victim's thigh areas,

25  anal canal and outer area of the vaginal cavity tested positive for blood and semen and further

26  testing of those fluids revealed DNA belonging to both petitioner and the victim.  (Id. at 7.)

27  Dr. Azar performed the autopsy on the victim and determined that she died of

28  asphyxiation due to strangulation.  (Id.)  The victim had injuries to her lower lip, bruises on her

right breast and shoulder, abrasions on her left clavicle, bruises on the front of her right leg, and an abrasion just below the left knee. (<u>Id.</u>) The victim also had internal injuries in the neck area, a fracture of the right hyoid bone, and a fracture of the Adam's apple. (<u>Id.</u>) Azar testified that some of the injuries were consistent with strangulation and ligation, while others show "quite a bit of force was used," which suggested more force than expected from just the squeezing of hands. (<u>Id.</u>) The contusion and abrasion on her lip and pressure mark on her chin were consistent with having force applied to the back of her head, pushing her chin into the seat. (<u>Id.</u> at 8.) Azar noticed sperm heads present in the victim's anal and vaginal areas. (<u>Id.</u>) She was unable to conclude when the sexual acts occurred in relation to her death, and could not opine when the time of death was. (<u>Id.</u>) She did express that the intercourse occurred before death, that there was no evidence of trauma or force in the vaginal or anal areas of the victim, and the injuries to the shoulder, breast, and neck appeared to be fresh injuries. (<u>Id.</u>)

The victim's ex-boyfriend, Theodore Mejia, testified that he met the victim around 1991, and dated her for about three or four years. (<u>Id.</u> at 9.) He testified that they split up around 1998 or 1999. (<u>Id.</u>) He stated that the victim would never be "desperate enough to . . . get[] beat on or hav[e] anal sex and [be] tied up and choked . . . she wouldn't go that far." (<u>Id.</u>) Mejia admitted that he had only seen the victim two or three times over the past four or five years and they never discussed her prostitution activities. (<u>Id.</u>)

Three witnesses testified on petitioner's behalf that he was a non-violent, peaceful person who was never drunk at work. (<u>Id.</u>) Petitioner's wife, Ofelia Chico Peres, testified that since 1998, petitioner has only ever slapped or tried to hit her two times. (<u>Id.</u> at 10.) Peres testified that on January 13, 2002, she and petitioner were at her Uncle Hilario's birthday party and arrived around 7:00 p.m. (<u>Id.</u>) Four men, including petitioner, shared a bottle of tequila and drank beer. (<u>Id.</u>) By the time Peres left at 10:00 p.m., petitioner was really drunk. (<u>Id.</u>) Petitioner did not eat very much at the party. (<u>Id.</u>)

Hilario Chico testified that at his party, petitioner ate very little and left around 10:30 or 11:00 p.m. (<u>Id.</u>) Chico had seen petitioner drink too much before and just fall asleep. (<u>Id.</u>) Petitioner's younger brother testified that in 2001, petitioner would drink ten to fifteen beers and

1   always get drunk.  (Id. at 11.)  He recalled two incidents when petitioner drank a lot and could

2   not remember events.  (Id.)  Three other people testified that petitioner drank quite frequently

3   and recounted times when he would drink so much that he would forget what had happened

4   when he was intoxicated.  (Id. at 12-13.)

5        Petitioner testified that he was already drunk and dizzy when he left Hilario's party.  (Id.

6   at 13.)  He and two other men went to a bar afterward and drank more alcohol.  (Id. at 13-14.)

7   After he left the bar, petitioner testified that he did not remember anything, but does remember

8   waking up in his car and seeing a woman's body in the passenger seat next to him.  (Id. at 14.)

9   Because he was confused and scared, he took the body out, got back into the car, and lay back

10  down to try to remember what had happened.  (Id.)  Then, the police showed up.  (Id.)

11       Dr. Slade testified that the more alcohol a person drinks, the greater the irreversible

12  amnesiac effect on the brain.  (Id.)  Slade testified that even if a person's body becomes more

13  tolerant to alcohol, the body cannot become more tolerant to blacking out.  (Id. at 15.)  Further,

14  Slade stated that a blackout meant a person did not remember what he did, but it has nothing to

15  do with the person's actual state of mind at the time.  (Id.)

16       Dr. Gomez testified that petitioner had borderline intellectual functioning and learned to

17  self-medicate with alcohol.  (Id.)  Gomez concluded that petitioner was not a person who thought

18  things through, but "responds to things at the moment," and opined that petitioner "demands a

19  high level of attention and expresses resentment and hostility when his perceived needs are not

20  met."  (Id. at 15-16.)

21       On April 26, 2004, petitioner was charged with murder.  (Id. at 2.)  The information also

22  charged the special circumstance of murder while engaged in rape and murder while engaged in

23  sodomy, and use of a deadly weapon.  (Id.)  After its case-in-chief, the prosecution dismissed the

24  special circumstance of murder while engaged in rape.  (Id.)  The jury found petitioner guilty of

25  first degree murder, and found true the sodomy felony-murder special allegation, and the use of a

26  deadly weapon allegation.  (Id.)  The trial court sentenced petitioner to life without the

27  possibility of parole plus one year.  (Id.).  In 2007, on direct appeal, the state appellate court

28  affirmed the judgment.  The state supreme court denied the petition for review.  The instant

1   federal petition was filed on June 2, 2009.

2                                   **DISCUSSION**

3   **A.   <u>Standard of Review</u>**

4           Because the instant petition was filed after April 24, 1996, it is governed by the

5   Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant

6   restrictions on the scope of federal habeas corpus proceedings.  Under the AEDPA, a federal

7   court may not grant habeas relief with respect to a state court proceeding unless the state court's

8   ruling was "contrary to, or involved an unreasonable application of, clearly established federal

9   law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was

10  based on an unreasonable determination of the facts in light of the evidence presented in the

11  State court proceeding."  28 U.S.C. § 2254(d)(2).

12          "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

13  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

14  law or if the state court decides a case differently than [the] Court has on a set of materially

15  indistinguishable facts."  <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  "Under the

16  'unreasonable application clause,' a federal habeas court may grant the writ if the state court

17  identifies the correct governing legal principle from [the] Court's decisions but unreasonably

18  applies that principle to the facts of the prisoner's case."  <u>Id.</u>  "[A] federal habeas court may not

19  issue the writ simply because the court concludes in its independent judgment that the relevant

20  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

21  that application must also be unreasonable."  <u>Id.</u> at 411.

22          "[A] federal habeas court making the 'unreasonable application' inquiry should ask

23  whether the state court's application of clearly established federal law was 'objectively

24  unreasonable.'"  <u>Id.</u> at 409.  In examining whether the state court decision was objectively

25  unreasonable, the inquiry may require analysis of the state court's method as well as its result.

26  <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th Cir. 2003).  The "objectively unreasonable"

27  standard does not equate to "clear error" because "[t]hese two standards . . . are not the same.

28  The gloss of clear error fails to give proper deference to state courts by conflating error (even

1  clear error) with unreasonableness." Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

2      A federal habeas court may grant the writ if it concludes that the state court's

3  adjudication of the claim "resulted in a decision that was based on an unreasonable

4  determination of the facts in light of the evidence presented in the State court proceeding." 28

5  U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made

6  by a state court unless the petitioner rebuts the presumption of correctness by clear and

7  convincing evidence. 28 U.S.C. § 2254(e)(1).

8  **B.    Petitioner's Claims**

9      As grounds for federal habeas relief petitioner claims: (1) the evidence was insufficient

10 to support a finding of the element of "force" in the felony murder special circumstance; (2) the

11 admission of Mejia's testimony violated petitioner's right to due process and confrontation;

12 (3) counsel rendered ineffective assistance when he failed to object to Mejia's testimony; and (4)

13 the trial court improperly refused to give a correct CALJIC voluntary intoxication instruction as

14 requested by petitioner.

15      1.    Sufficiency of the evidence

16      Petitioner claims that the evidence was insufficient to support a finding that the sodomy

17 was committed by "force or fear of immediate and unlawful bodily injury on the victim." Cal.

18 Penal Code § 286(d). (Petition at 9, n.2.) Further, petitioner argues that there was no evidence

19 presented that he killed the victim while he was "engaged in the commission of sodomy." Cal.

20 Penal Code § 190.2(a)(17). (Id. at 9-10.)

21      The Due Process Clause "protects the accused against conviction except upon proof

22 beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

23 charged." In re Winship, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a

24 state court conviction does not determine whether it is satisfied that the evidence established

25 guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal

26 court "determines only whether, 'after viewing the evidence in the light most favorable to the

27 prosecution, any rational trier of fact could have found the essential elements of the crime

28 beyond a reasonable doubt.'" See id. (quoting Jackson v. Virginia, 443 U.S. 307, 321, 319

1   (1979).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable

2   doubt, may the writ be granted.  <u>See</u> <u>Jackson</u>, 443 U.S. at 324.  The <u>Jackson</u> standard must be

3   applied with explicit reference to the substantive elements of the criminal offense as defined by

4   state law.  <u>Sarausad v. Porter</u>, 479 F.3d 671, 678 (9th Cir. 2007).

5       California law requires:

    . . . as part of the felony-murder doctrine that the jury find the perpetrator had the
6   specific intent to commit one of the enumerated felonies [in section 189].  It also
    is established that the killing need not occur in the midst of the commission of
7   the felony, so long as that felony is not merely incidental to, or an afterthought
    to, the killing.  In addition, a homicide occurs in the perpetration of an
8   enumerated felony for the purpose of the felony-murder rule if both offenses
    were parts of one continuous transaction.  There is no requirement of a strict
9   "causal" or "temporal" relationship between the "felony" and the "murder.  In
    addition, circumstantial evidence may provide sufficient support for a felony
10  murder conviction.

11  <u>People v. Prince</u>, 40 Cal. 4th 1179, 1259 (2007) (internal citations and quotation marks omitted).

12  Further, the jury was instructed that in order to find the special circumstance of forcible sodomy,

13  the jury had to find that: (1) petitioner committed sodomy with another person; (2) it was not

14  consensual; and (3) petitioner committed the act by force, violence, duress, menace, or fear of

15  immediate and unlawful bodily injury.  (CT 906.)

16       The California Court of Appeal reviewed the evidence and determined that there was

17  substantial evidence to support the felony-murder special circumstance of forcible sodomy.

18  (Resp. Ex. B at 18-20.)  Specifically, it determined that petitioner's DNA was found in the

19  victim's anal tract.  (<u>Id.</u> at 19.)  Petitioner's psychologist testified that when petitioner believes

20  his needs are not being met, he expresses "resentment and hostility."  (<u>Id.</u>)  Further, the court

21  noted that the physical injuries supported a finding that the sodomy was committed by force and

22  violence.  (<u>Id.</u>)  Namely, the victim suffered a contusion on her inner lip, and the patterned marks

23  on her chin, nose, and stomach were consistent with her face and body being forced into the seat

24  of the car.  (<u>Id.</u>)  Also, her remaining injuries were all injuries to the front of her body, which

25  was consistent with being held down.  (<u>Id.</u> at 19-20.)  In addition, the court determined that the

26  evidence supported the finding that the sodomy and the murder were part of one continuous

27  transaction.  (<u>Id.</u> at 20.)  The jury could find that after the victim got into petitioner's car, he had

28

1   sex with her.  (<u>Id.</u>)  At some point, she resisted and he forcibly sodomized and strangled her.

2   (<u>Id.</u>)  The medical examiner also testified that all the injuries were fresh, which suggested that

3   they occurred around the time of death.  (<u>Id.</u>)

4          Reviewing the record and viewing the evidence in the light most favorable to the

5   prosecution, a rational trier of fact could have found that petitioner committed sodomy on the

6   victim based on the petitioner's sperm found within the victim's anal cavity and upper thighs.

7   Further, evidence that can lead to a reasonable inference that petitioner was using force against

8   the victim during the sodomy were:  the patterned imprints upon the victim's chin; the white

9   blanching on her nose, suggesting that it was being pressed up against something; the testimony

10  that when rigor mortis sets in, the body picks up patterns of the surface it is lying on; the fact that

11  all of the victim's injuries were located on the front of her body; and the lip abrasion, which was

12  consistent with having force applied to the back of the victim's head, and pushed into the seat.

13  In addition, Mejia's testimony that the victim would never engage in anal sex or agree to getting

14  choked, even if improperly admitted,[2] also lends support to the jury's finding of forcible sodomy.

15         Further, all the injuries appeared to be "fresh injuries;" the assistant medical examiner

16  testified that sometimes, spontaneous defecation occurs when a person expires; and fecal matter

17  was found on the passenger side front floor and front seat, as well as on the used condom,

18  suggesting that the victim's death occurred at or near the time of the sodomy.  Moreover, the

19  psychologist opined that petitioner's personality was such that he reacts quickly to stimuli rather

20  than thinking before acting, and "demands a high level of attention and expresses resentment and

21  hostility when his perceived needs are not met."[3]  (<u>Id.</u> at 16.)  These facts lead to a reasonable

22  _____

23      [2] Petitioner argues that Mejia's testimony was inadmissible.  Regardless of its
    admissibility, a federal court reviewing an insufficiency of the evidence claim must consider all
24  of the evidence admitted at trial.  <u>See</u> <u>McDaniel v. Brown</u>, 130 S. Ct. 665, 672 (2010).  Thus,
    although ultimately, there was sufficient evidence even without this testimony, this court
25  includes it in the analysis.

26      [3] The court rejects petitioner's argument that, where the defendant moved for a judgment
27  of acquittal, review of a sufficiency of the evidence claim can only be based on evidence that
    was presented at the close of the prosecution's case, and not based on evidence presented in the
28  defense case.  Thus, argues petitioner, the court should not use the defense witness'

1   inference that the sodomy and the death occurred in one continuous transaction.

2         The court is mindful that there may be more than one reasonable inference suggested by

3   the record, however, a federal habeas court "must presume – even if it does not affirmatively

4   appear on the record – that the trier of fact resolved any such conflicts in favor of the

5   prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.  Here was sufficient

6   evidence to find that petitioner committed the acts of forcible sodomy and murder within one

7   continuous transaction.  Thus, the state court's application of the Jackson standard was not

8   objectively unreasonable.  See McDaniel, 130 S. Ct. at 673.

9         2.      Admission of Mejia's testimony

10        Petitioner argues that the testimony of Mejia violated the Due Process and Confrontation

11  Clauses.  In a pretrial motion, petitioner objected to the testimony of Mejia as inadmissible

12  because it was irrelevant, and also on other state evidentiary grounds.  (CT 373, 377, 703-07;

13  Augmented Transcript RT (ATRT) 48-52.)  Specifically, petitioner argued that Mejia's

14  testimony that he and the victim never engaged in anal sex when they were dating, and Mejia's

15  opinion that the victim would never agree to anal sex with anyone were not admissible under any

16  theory and that even if either of them were, they were more prejudicial than probative.  (CT 703-

17  707.)  The trial court ruled that it would allow Mejia's testimony only as it pertained to his

18  personal experience with the victim and what he observed, but not allow it as to his opinion

19  about whether the victim would have engaged in anal sex, or whether it was her habit not to

20  engage in anal sex.  (ATRT 48-49.)

21        During petitioner's cross-examination of Mejia, Mejia confirmed that he had never

22  discussed the victim's prostitution activities with her.  (Resp. Ex. B at 23.)  Then, defense

23  counsel asked whether Mejia remembered speaking with the police and telling them that he

24  thought "that was a sign of her being desperate."  (RT at 321-22.)  Petitioner continued the

25  questioning, "Do you recall the inspectors asking you if she would be the kind of person or

26  _____

27  psychologist's testimony in its analysis.  However, the Ninth Circuit has made clear that, in these
    situations, a federal habeas court should not limit itself to evidence presented by the prosecution
28  in its case in chief.  See LaMere v. Slaughter, 458 F.3d 878, 881-82 (9th Cir. 2006).

1    hookers on Capp Street desperate and desperate people do desperate things? . . . And did you

2    agree with their description of prostitutes that were . . . working on Capp Street?"  (Id.)  On

3    redirect, the prosecutor "followed up on defense counsel's suggestion that [the victim] must have

4    been desperate to be working as a prostitute on Capp Street."  (Id.)  The prosecutor asked Mejia

5    why he did not agree with the police characterization of prostitutes who worked on Capp Street,

6    and Mejia answered, "Because I told them that she never be des -- desperate enough to do just

7    like anything.  She would rather be sick than to do something that she didn't do."  (Id. at 322-

8    23.)  In response to the prosecutor's question asking Mejia to elaborate on what he meant when

9    he said that the victim didn't do "crazy stuff," Mejia answered, "Like getting beat on or having

10   anal sex and tied up and choked and whatever.  Stuff like that.  She would rather be sick and

11   throw up and whatever.  But she wouldn't do -- she wouldn't go that far."  (Id.)

12         The California Court of Appeal rejected these claims.  It concluded that the trial court did

13   not abuse its discretion in allowing the testimony that Mejia and the victim never engaged in anal

14   sex because it was relevant and probative.  (Resp. Ex. B at 24.)  With respect to the remaining

15   claims regarding Mejia's testimony on redirect, the Court of Appeal concluded that petitioner

16   failed to preserve the issue for review and thus, the claims were waived.  (Id. at 25.)  In addition,

17   continued the court, because defense counsel "opened the door" that the trial court had closed to

18   the prosecution, the appellate court found no error in the admission of Mejia's testimony.  (Id.)

19         A federal court will not review questions of federal law decided by a state court if the

20   decision also rests on a state law ground that is independent of the federal question and adequate

21   to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  The Ninth

22   Circuit has recognized and applied the California contemporaneous objection rule in affirming

23   denial of a federal petition on grounds of procedural default where there was a complete failure

24   to object at trial.  See Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005).

25         Here, even though the Court of Appeal denied this claim both on the merits and because

26   of the contemporaneous objection rule, federal habeas review is still barred.  See Bennett v.

27   Mueller, 322 F.3d 573, 580 (9th Cir. 2003) ("A state court's application of a procedural rule is

28   not undermined where, as here, the state court simultaneously rejects the merits of the claim.").

1   Although petitioner argues that the trial court granted his request to have all of his pretrial

2   objections automatically deemed made at trial and preserved (CT 373, 377), because his pretrial

3   objections were made solely on the basis of state evidentiary grounds, no federal claims were

4   preserved.  See, e.g., Davis v. Woodford, 384 F.3d 628, 653-54 (9th Cir. 2004) (finding

5   Confrontation Clause claim procedurally barred where state supreme court found constitutional

6   claim waived because petitioner failed to raise it below).  Thus, petitioner's claim regarding the

7   improper admission of Mejia's testimony is barred from federal review.

8          Even assuming that petitioner had not defaulted, a state court's evidentiary ruling is not

9   subject to federal habeas review unless the ruling violates federal law, either by infringing upon

10   a specific federal constitutional or statutory provision or by depriving the defendant of the

11   fundamentally fair trial guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984).

12   The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

13   prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

14   writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's

15   admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit

16   precedent but not contrary to, or an unreasonable application of, clearly established Federal law

17   under § 2254(d)).  Failure to comply with state rules of evidence is neither a necessary nor a

18   sufficient basis for granting federal habeas relief on due process grounds.  See Jammal v. Van de

19   Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

20          Thus, petitioner's due process claim that the testimony was irrelevant and/or prejudicial

21   is foreclosed in light of the fact that there is no clearly established federal law.  Holley, 568 F.3d

22   at 1101; see also id. at 1098 ("When there is no clearly established federal law on an issue, a

23   state court cannot be said to have unreasonably applied the law as to that issue.").

24          Finally, although petitioner asserts that the admission of Mejia's testimony also violated

25   the Confrontation Clause, he only mentions the Confrontation Clause in his heading to the

26   argument, and in a single sentence that states, "The admission of this evidence violated his

27   federal constitutional right of confrontation under Crawford v. Washington, 541 U.S. 36 (2004) .

28   . ." (Petition at 18.)  Conclusory assertions such as these that are not supported by a statement of

1   facts do not warrant habeas relief.  See Jones v. Gomez, 66, F.3d 199, 204-05 (9th Cir. 1995).

2          3.      Ineffective assistance of counsel

3          Petitioner argues that he received ineffective assistance of counsel because counsel failed

4   to object to Mejia's redirect testimony and thus, failed to preserve the issue for review.  (Petition

5   at 21.)

6          In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

7   must establish two things.  First, he must establish that counsel's performance was deficient, i.e.,

8   that it fell below an "objective standard of reasonableness" under prevailing professional norms.

9   Strickland, 466 U.S. at 687-88.  Second, he must establish that he was prejudiced by counsel's

10  deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

11  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

12  reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

13  The Ninth Circuit has determined that a "doubly deferential judicial review" is appropriate in

14  analyzing ineffective assistance of counsel claims because the general rule of Strickland, i.e., to

15  review a defense counsel's effectiveness with great deference, gives the state courts greater

16  leeway in reasonably applying that rule, which in turn "translates to a narrower range of

17  decisions that are objectively unreasonable under AEDPA."  Cheney v. Washington, 614 F.3d

18  987, 995 (9th Cir. 2010).

19         The California Court of Appeal concluded that during cross-examination, trial counsel

20  "made the calculated decision to question Mejia about a statement he gave to the police in an

21  effort to establish that the victim had to be 'desperate' in order to prostitute herself on Capp

22  Street."  (Resp. Ex. B at 27.)  "Defense counsel's calculated tactical decision to attempt to elicit

23  testimony which was potentially damaging to the People's case and potentially helpful to

24  [petitioner's] case does not translate into ineffective assistance merely because the prosecutor

25  sought to rebut such testimony on redirect.  Indeed, this is precisely the sort of 'second guessing'

26  with the benefit of hindsight which Strickland prohibits."  (Id.)  The Court of Appeal

27  added that even if counsel's performance was deficient, there was no prejudice.  (Id.)

28         Where, as here, petitioner bases this claim solely on the trial record, the strong

presumption that counsel acted for tactical reasons "takes on particular force."  Yarborough v.

Gentry, 540 U.S. 1, 6 (2003) (per curiam).  In light of this presumption, and the state court's

analysis, it is not objectively unreasonable for the state court to conclude that counsel's decision

to present those questions on cross-examination, forfeiting his opportunity to object, was a

tactical choice.  See Cheney, 614 F.3d at 996.  Because the court finds that counsel's

performance was not deficient, it is unnecessary to address the prejudice prong.  See Siripongs v.

Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

    4.    Jury instruction

    Petitioner challenges the trial court's jury instructions regarding voluntary intoxication.

Specifically, at trial, he requested CALJIC 4.21.1, which states, "If the evidence shows that a

defendant was intoxicated at the time of the alleged crime, you **should** consider that fact in

deciding whether or not defendant had the required specific intent or mental state."  See CALJIC

4.21.1[4] (emphasis added).  Instead, the trial court gave CALCRIM Nos. 625,[5] 626,[6] and 3426.[7]

─────────────────

    [4] CALJIC 4.21.1 also provides: [T]he fact that the defendant was voluntarily intoxicated
is not a defense and does not relieve defendant of responsibility for the crime. . . .
    [[W]here a specific intent is an essential element of a crime], you should consider the
defendant's voluntary intoxication in deciding whether the defendant possessed the required
specific intent at the time of the commission of the alleged crime. . . .
    If the evidence shows that a defendant was intoxicated at the time of the alleged crime,
you should consider that fact in deciding whether or not defendant had the required specific
intent.
    If from all the evidence you have a reasonable doubt whether a defendant had the
required specific intent, you must find that defendant did not have that specific intent.

    [5] CALCRIM 625 provides:
    You may consider evidence, if any, of the defendant's voluntary intoxication only in a
limited way.  You may consider that evidence only in deciding whether the defendant acted with
an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant was
unconscious when he acted, or the defendant intended to commit the crime of sodomy.
    A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using
any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating
effect, or willingly assuming the risk of that effect.
    You may not consider evidence of voluntary intoxication for any other purpose.

    [6] CALCRIM 626 provides:
    Voluntary intoxication may cause a person to be unconscious of his or her actions.  A

1    Petitioner argues that CALCRIM 3426's use of "may" rather than CALJIC 4.21.1's use of

2    "should," lessened the prosecution's burden of proof and prevented him from presenting a

3    complete defense.  Specifically, petitioner asserts that telling the jury that it "may" consider a

4    voluntary intoxication defense rather than "should" could have instructed the jury that it could

5    reject the intoxication evidence altogether.  (Petition at 26.)

6         To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

7    the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

8    process.  See Estelle v. McGuire, 502 U.S. 62, 72 (1991).  The instruction may not be judged in

9    _____

10   very intoxicated person may still be capable of physical movement but may not be aware of his
     or her actions or the nature of those actions.

11        A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using
     any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating

12   effect, or willingly assuming the risk of that effect.

13        When a person voluntarily causes his or her own intoxication to the point of
     unconsciousness, the person assumes the risk that while unconscious he or she will commit acts

14   inherently dangerous to human life.  If someone dies as a result of the actions of a person who
     was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter.

15        Involuntary manslaughter has been proved if you find beyond a reasonable doubt that:
          1. The defendant killed without legal justification or excuse;

16        2. The defendant did not act with the intent to kill;

17        3. The defendant did not act with a conscious disregard for human life;
          AND

18        4. As a result of voluntary intoxication, the defendant was not conscious of (his/her)
     actions or the nature of those actions.

19        The People have the burden of proving beyond a reasonable doubt that the defendant was

20   not unconscious.  If the People have not met this burden, you must find the defendant not guilty
     of murder.

21

22        [7] CALCRIM 3426 provides:
          You **may** consider evidence, if any, of the defendant's voluntary intoxication only in a

23   limited way.  You **may** consider that evidence only in deciding whether the defendant acted with
     the intent to do the act required.

24        A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using
     any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating

25   effect, or willingly assuming the risk of that effect.

26        In connection with the charge of murder, the People have the burden of proving beyond a
     reasonable doubt that the defendant acted with malice aforethought.  If the People have not met

27   this burden, you must find the defendant not guilty of murder.
          You may not consider evidence of voluntary intoxication for any other purpose.

28   (emphasis added).

1   artificial isolation, but must be considered in the context of the instructions as a whole and the

2   trial record.  See id.  In other words, the court must evaluate jury instructions in the context of

3   the overall charge to the jury as a component of the entire trial process.  United States v. Frady,

4   456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).

5           In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or

6   would have understood the instruction as a whole; rather, the court must inquire whether there is

7   a "reasonable likelihood" that the jury has applied the challenged instruction in a way that

8   violates the Constitution.  See Estelle, 502 U.S. at 72 & n.4.  In order to show a due process

9   violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury

10   applied the instruction in a way that violates the Constitution, such as relieving the state of its

11   burden of proving every element beyond a reasonable doubt.  Waddington v. Sarausad, 129 S.

12   Ct. 823, 831 (2009) (internal quotations and citations omitted.)  A determination that there is a

13   reasonable likelihood that the jury has applied the challenged instruction in a way that violates

14   the Constitution establishes only that an error has occurred.  See Calderon v. Coleman, 525 U.S.

15   141, 146 (1998).  If an error is found, the court also must determine that the error had a

16   substantial and injurious effect or influence in determining the jury's verdict, see Brecht v.

17   Abrahamson, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.  See

18   Calderon, 525 U.S. at 146-47.

19           The California Court of Appeal rejected petitioner's claim.  It determined that both

20   CALJIC 4.21.1 and CALCRIM 3426 were legally correct in that they both accurately stated the

21   law.  (Resp. Ex. B at 31.)  Further, the just was informed that it could consider any evidence of

22   petitioner's intoxication in deciding whether petitioner formed the intent to kill, or intended to

23   commit sodomy, or was unconscious when he acted.  See CALCRIM 625.  Thus, concluded the

24   Court of Appeal, the instructions as a whole sufficiently instructed the jury on his theory of the

25   defense.  (Id.)  The court stated that CALCRIM 3426 and CALJIC 4.21.1 were both limiting

26   instructions that confined the jury to considering evidence of voluntary intoxication only for

27   certain purposes.  (Id. at 32-33.)  Further, CALCRIM 3426 did not instruct the jury that it could

28   reject intoxication evidence without considering it altogether.  (Id. at 33.)  Both instructions

1  informed the jury that it was permitted to consider evidence of voluntary intoxication for the

2  specific purpose of determining whether a defendant acted with the requisite specific intent.

3  (Id.)  The court concluded that there was no reasonable possibility that the use of CALCRIM

4  3426 instead of CALJIC 4.21.1 affected the outcome of trial.  (Id.)

5         This court agrees.  Viewing the instructions as a whole, the given CALCRIM instructions

6  adequately embodied petitioner's theory of defense, which is all due process requires in this

7  situation.  See United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996) (where the given

8  instructions adequately embody the defense theory, defendant is not entitled to have jury

9  instructions raised in his precise terms).  The jury was informed that voluntary intoxication can

10 make a defendant unconscious of his actions, thereby negating the ability to act with the requisite

11 intent.  The jury was also told that it was the prosecution's burden to prove that petitioner was

12 not unconscious when he committed the crimes.  Although the petitioner focuses on the meaning

13 of "may" (as found in CALCRIM 3426) as being permissive and "should" (as found in CALJIC

14 4.21.1) as connoting a mandate, the Ninth Circuit's decision in United States v. Marcucci is

15 instructive.  299 F.3d 1156 (9th Cir. 2002).  There, the Court concluded that the use of "should,"

16 when used in a grand jury charge, "does not eliminate discretion."  Id. at 1159.  "The charge, by

17 telling the jury that it 'should' rather than 'shall' or 'must' indict if it finds probable cause,

18 leaves room -- albeit limited room -- for a grand jury to reject an indictment . . ."  Id. at 1164.

19 Thus, "may" and "should" both have permissive meanings that give the jury discretion to

20 choose.  On this record, there is no evidence that the jury could reasonably have applied

21 CALCRIM 3426 in a way that violated the Constitution.  Petitioner's claim that giving

22 CALCRIM 3426 rather than CALJIC 4.21.1 so infected the entire trial so that the conviction

23 violates due process is denied.

24                                        **CONCLUSION**

25        For the reasons set forth above, the court concludes that petitioner has failed to show a

26 violation of his federal constitutional rights in the underlying state criminal proceedings.

27 Accordingly, the petition for writ of habeas corpus is DENIED.  The clerk shall close the file.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF APPEALABILITY**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling.  Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights, or demonstrate that a reasonable jurist would find the denial of his claims debatable or wrong.  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Accordingly, a COA is DENIED.

IT IS SO ORDERED.

DATED: ___3/2/11___

_Ronald M. Whyte_
RONALD M. WHYTE
United States District Judge

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.Rmw\HC.09\Torres431denhc.wpd     17